May it please the Court, my name is Rick Seabolt. I represent Launch Media and Yahoo. It is important to recognize that this is a duty-to-defend case in no small part because there are about three decades of California Supreme Court decisions addressing the significance of the duty-to-defend, starting with Gray v. Zurich, which holds that the duty-to-defend is broader than the duty-to-indemnify, and indeed, a policyholder cannot live without a duty-to-defend. simply because of the allegations in a complaint. What is the status of the underlying case? Actually, thank you, Your Honor. In fact, it is set for trial in February. Yahoo, at this point, has incurred in excess of eight figures in defense costs in preparation for the trial, and the trial has not yet occurred. Again, it is set for February. I think the next significant case is the Montrose I case, which sets out the obligation of an insurer when moving for summary judgment on the duty-to-defend. There are two aspects. One, they must show that, indeed, the meaning that they offer is the only reasonable interpretation of the policy, and I feel they fail in that. Secondly, they must show that under no set of facts is it possible that there is a potential for coverage. Next is the Buss case, which holds that even if there is but one cause of action or claim in a complaint, that triggers a full and complete duty-to-defend by the insurer. And next is the Aerojet case, which involved successive policies, one complaint, and holds that, in fact, if there are events that trigger successive policies, even though in one complaint, there is a full and complete duty-to-defend for each insurer on each policy. With that background, I think it is also important to recognize that there are two very common forms of liability insurance, claims made coverage and occurrence coverage. Occurrence coverage is more typical, and there are many different ways of categorizing insurance. This relates to the trigger of coverage. Occurrence policies, the trigger is whether an occurrence occurred during the policy period. That's determined by the date when damage occurs. And another type of policy, claims made, the trigger, that is, what must occur during successive policies, is when the claim is first made. This policy is neither. This policy is a media liability policy where the trigger is when matter is first uttered or disseminated. And, indeed, I don't know whether it made it to your honors. I handed to the clerk a timeline just to help. It's illustrative of the facts just to make sure that, in fact, we all have them in mind. It was presented to the trial court and reviewed by the trial court. There had been an objection. The objection was overruled. Again, the point is illustration. So if Liquid Dreams comes out of the underlying suit, do you still contend that the duty-to-offend extends into the second policy period? Absolutely, Your Honor. Why? Indeed, that's the issue. Because, first, the second policy is triggered because matter was first uttered and disseminated in the second policy period. Again, that's undisputed, and I don't think they really contend otherwise. Right. But if that comes up, you're talking about the Liquid Dreams, among others. Is there anything else? That's right, Your Honor. And, indeed, the real issue in the case relates to what we've called the aggregation clause. There is a clause in the policy that defines what each loss is. And the function of the clause is to aggregate in certain circumstances and determines whether or not something is treated as the same loss or each loss or whether they're separate losses. Now, the second policy is triggered because Liquid Dreams, and it's undisputed, the owner of the copyright J records didn't even exist in the first policy period. Right. But if, for example, if that were amended, specifically amended out of the pending litigation, my question is, does the duty-to-defend still extend to the instant suit? It does, Your Honor. And the reason for this is the way we wind up focusing on Liquid Dreams, again, under the Matras case, it's quite clear their burden is to show that under no set of facts is there the potential for coverage under the second policy. Right. They didn't do that. We came up with an actual concrete example. We don't have to do that. We just have to show that there's a potential. And, indeed, they need to show that there is no potential, that under no set of facts could the second policy be triggered. We actually came up with a hard, concrete example. Liquid Dreams was first played on launch during the second policy period. That triggers the second policy. The next step of the analysis is, does it fall within the aggregation clause? That is, can National take the fact that Liquid Dreams or other songs were played in the second policy and treat it and collapse it so that the coverage is only under their first policy? It's not just because a particular song is played for the first time in the second period, is it? Or is that enough in your view? Well, that's clearly enough. And that's the reason why I went through the background. But the only example you have, and I understand your argument about the burden, but the only example you have is the one song, Liquid Dreams, right? That's true, Your Honor. Okay. Their burden is to show that there cannot be under any set of facts an example that triggers the second policy. Well, I'm not sure they have to prove that. You'll have to show potential. They don't have to prove with absolute certainty. No, actually, Your Honor, I think it's quite clear under the Montrose 1 decision they do have to prove that. The duty to defend, as directed by the California Supreme Court, is so broad that if there is the potential, they have the duty. It is their burden to show that there is no potential. And, again, we've come up with a hard, concrete example based on the records in the facts of the case. Liquid Dreams was played during the second policy period. The next step of the analysis is, does the aggregation clause applies? As we've said in the brief, the aggregation clause, it's interesting. This is a media liability policy that was applied to traditional media policyholders. The Internet is not traditional, but if you look at the policy and you look at the policy language, the origins of the language that are in the aggregation clause, they talk about you aggregate if damages and expenses arising out of utterances and dissemination of matter relate to the same subject, person, or class of persons. Where does that language come from? It comes from defamation law. We cited the Restatement of Torts. The defamation law talks about subject persons, class of persons, and if you think of this policy in that context, it makes sense. In fact, if someone makes a defamatory statement and the subject of the defamatory statement is the same, it makes sense that that would fall under one policy. Similarly, if the target is a single person, it makes sense that that would fall under one policy. Similarly, if it's class of persons, which may be the most confusing part of this policy as applied to these facts, and again, they, of course, chose the language. We didn't. They chose this language to apply to Internet liability. We didn't. Class of persons is a recognized kind of term of art within defamation law and would apply, for example, if someone made a slanders or defamatory comment about, say, members of a church or members of a club or members of a company. And in a setting like that, you would want to aggregate it so that it is treated as one loss. Now, the policy language also goes on and says repetitions of the same thing over and over again does not trigger a new policy. Having said that, now we look at the facts of the case and how the aggregation clause applies and what a reasonable interpretation of that clause is. We only need to show that there is another reasonable interpretation of the clause. Indeed, I believe our interpretation is the most reasonable interpretation of the clause, and indeed, their interpretation is not reasonable. That's not my burden, but I hope to convince you that, in fact, that's the case. The first element of the aggregation clause is same subject. Obviously, a reasonable interpretation of the word subject in this setting is a song. It has each song has a different subject. The clause is quite clear that if you play the same song over and over again, that doesn't give rise to yet another claim under the policy. But it is a logical and reasonable interpretation that each song has a different subject, and as a result, subject doesn't aggregate. Their position is, and frankly, that interpretation I think also tracks with what I said a moment ago, that the origins of this policy relate to defamation claims. I think subject in a defamation claim would talk about the subject or content of the defamatory statement. Here, the subject or content is the content of the song. Their position is, no, no, no, no. Subject means copyright infringement when you play music. The effect of that interpretation, and the reason they use that is because they need to capture, for example, Liquid Dreams and other songs that were first played in the second policy period. The problem with the interpretation is in an effort to capture what happens during the second policy, they wind up with an interpretation that is way overbroad. The effect of that interpretation would be, for example, if you have three successive policies, third policy isn't involved here, but if music were played in the third policy period, a totally different copyright owner than anybody was involved in the other, under their interpretation of subject, which is copyright infringement of any song played on the Internet, that totally separate music involving a separate policy. That makes no sense. That's a way overbroad interpretation of the policy. Now, again, all we need to show is that there is a reasonable interpretation because we're, of course, entitled to any ambiguities of the policy. I think it's quite clear that subject equating to song or the content of a song is a reasonable interpretation of their policy language. The second critical phrase in the aggregation clause is person. We say person means person. And that, indeed, at the time, for example, Liquid Dreams was first played during the second policy, thereby triggering the second policy, Jay Records was a different person than BMG. Now, it is true that later, after the lawsuit is filed, and the chart may be helpful on this. You may already have the facts in mind. But after the lawsuit is filed in the name of BMG, BMG then later acquires Jay Records. And, in fact, through the course of discovery, it becomes clear that BMG winds up asserting the copyright claims of not only its own copyrights, but also the rights that it has acquired, the Jay Records rights. We think procedurally, if the underlying action had involved thousands of songs, the way that would be dealt with most properly would be by a supplemental complaint. It's quite clear that when a plaintiff files a complaint, they can only assert the rights that the plaintiff has at the time the complaint is filed. If you acquire later facts that have changed after the facts, procedurally, the way that gets resolved is you make an application for a supplemental complaint. That wasn't done. The California case law is quite clear that the mere fortuity as to how pleadings occur in the underlying case doesn't deprive a policyholder of their ability to seek coverage, particularly the duty to defend, in a setting such as this. So, the issue with respect to person is, when do you look at whether it is or is not the same person? We acknowledge that if you looked at it, say, today, BMG and Jay Records are the same person. There is no doubt BMG acquired Jay Records. But, on the other hand, it is also quite clear that when Liquid Dreams was first played, the copyright owner who owned the copyright to Liquid Dreams was not the same person as BMG. It was a different person. Okay. What about class of persons? Your Honor, again, that's the phrase that is probably the most awkward from their policy. And, again, the reason for this is it was drawn from defamation, which is the which would not accomplish what they seek to accomplish. One interpretation that we put forward in our reply brief is it would be a sub-label. Within the music industry, there are big names like Sony, and there are a number of little labels that fall within the Sony group of companies. Another interpretation that we also mentioned in our brief might be, for example, members of a band who may jointly own a copyright. That would be a class, but wouldn't a class also be record companies? It could be, Your Honor. It could also, however, be, say, class actions. These are liability policies. The number one thing that liabilities apply to, in fact, the only thing under the powering decision by the California Supreme Court, the only thing that liability policies apply to are litigation. In a litigation context, one obvious meaning to the phrase class of persons would be members of a class in a class action, and we don't have a class action. And as a result, if that were the interpretation and if that's a reasonable interpretation, we as a policyholder entitled to the benefit of ambiguities in their policy language. And again, the reason why this happened is they took an old media liability policy that really applied reasonably well to defamation and applied it to an Internet company, where it doesn't apply very well. What you're saying is that that would be a class. That's right, Your Honor. I'm not saying why that would be the only class. And indeed, Your Honor, that's because that's not my burden. It is not my burden to show that the only reasonable interpretation is my interpretation. Indeed, under the Montrose case, it's quite clear. Here's a reasonable interpretation. When you're at the end, it's reasonable to say that that could be a class, class of persons. What's reasonable about saying it's the only class that's covered by the term class of persons? Again, Your Honor, I think my burden is simply to show that there is a reasonable interpretation that does not do what they say it does. And there are a number of reasonable interpretations. One is a sublabel. Another is joint owners of copyright, for example, members of a ban. Yet another would be members of a class action. None of those apply here, and as a result, they wouldn't aggregate. But there's yet, I think, maybe even a more important reason, and that is their interpretation to class of persons has the same fundamental problem that their interpretation of subject has. They would like class of persons to refer to all copyright owners of all music that's played on the Internet. And they need to come up with such a broad language for their aggregation clause to accomplish what they want to accomplish. They need to be able to do that. Kagan. Part of the difficulty that I've got with your position so far, as you've articulated it very well, is that it isn't founded in the complaint, I mean, in the underlying action, because the complaint that is you're asking to have defended asserts a decision to, in effect, have mass copyright infringement. It's not a case of somebody playing a Beatles song when they shouldn't have done, no matter what the label. I mean, so that's what is alleged, and that's what's being defended against. That's true, Your Honor. Indeed, that goes back to Gray v. Zurek. You may remember Gray v. Zurek involved a situation where a complaint alleged intentional conduct. Well, I'm not talking about the intentionality. Well, but the ---- I'm talking about the ---- it's not ---- what's alleged is that at a point in time there was a business decision made and a practice adopted and pursued to have mass copyright infringement. Indeed, Your Honor, my point is you're putting too much emphasis on the allegations. Well, but that's what you're asking them to defend. But indeed ---- I'm asking them to defend an individual copyright infringement issue. But in Gray v. Zurek, what was being asked to defend was the allegation was that it was intentional conduct, and you're right. I'm talking about the intentionality of it. I'm talking about it was a systemic, systematic thing. And if that's not so, if that's not correct, and you're trying to suggest to me that's not correct, then it seems to me the alternative is it puts you in the position of having to pay self-insured retention on each and every song that was hit, which of course you don't want to do and is a position you're not taking. No, Your Honor. Again, in fact, you're right. The allegations are a systematic decision. Like much in life, it is more complicated than that. In fact, Launch had individual discussions with each record label. Well, then, are you going to pay 25,000 bucks for each one of the hits? Well, Your Honor, if there was no aggregation based on persons, it's quite clear we both agree that persons is part of the aggregation clause, and there are 11 by our count, 10 by theirs, persons involved in the action. And as a result, there would be 10 SIRs. I think, again, that's really quite clear. That theory? Well, it seems to me hard. I'm not sure I understand their argument that although there are 10 record labels, there's one person, which is — I don't know of another theory that they have on this.  In one of the difficulties, although it's — It seems to me their theory is that there was one thing that happened, and that — One person, Your Honor, though? No. There was one subject. What happened was that that infringed, and the — I mean, the infringement was a mass offering of songs to which you had no license. And again, Your Honor, I think you're putting too much emphasis on the allegations of the complaint. What else are you supposed to put emphasis on in the duty-to-defend case? Montrose makes clear that, indeed, extrinsic evidence of what has happened also comes into play, and, indeed, we do know that, in fact, the actual claims involved in the lawsuit include liquid dreams, which was first played during the second policy, and thereby first triggered. Well, Your Honor, there could — there could, in theory, be lots of things that were first played in the second policy, and of the third policy, for that matter. But if it stems from one action, then what difference does it make? Because one action isn't in the policy. We need to look at this — It's one subject. I'm sorry? One subject. Well, one interpretation of what a subject is, is all copyright infringement. And that's their position. Sure. But you want — I mean, otherwise, if it — if they're not correct, then why isn't it — why doesn't it necessarily follow that you're on the hook for individual retentions on each infringement? Because of the aggregation language that focuses on person, it is clearly aggregated based on each person. And to the extent there is a different record label which owns copyright Where does label — see, I guess I just have trouble understanding where label even gets into it. Well, I think — I mean, music, I can understand. I can understand infringement terms saying, you know, if I play a song by whomever, that's an infringement. It doesn't really make much difference whose label it's under. But the aggregation clause — Be played a zillion times. So it's just one — I mean, it's one song being played a zillion times. And the policy language makes that clear. That only counts once. That's perfectly okay. But the policy language also makes clear that it gets aggregated based on person. And in this context, what that means is who owns the copyright. Okay. And the record labels own the copyrights. And there are 10 record labels who own the copyrights that brought this action. And you would aggregate it. And as a result, there would only be 10 SIRs by their count, 11 by ours. You have to give meaning to the word person. You can't just ignore it. Yes, they've argued, oh, there are all these songs that are played. You wouldn't want to play thousands of SIRs. That's a red herring. They ignore their own policy language. You have to give meaning to the word person. And the only reasonable interpretation of the word person that's in their policy language is to focus on what people or persons or entities own copyrights. And in this case, it's clear. There were 10. And if you also look at Jay Records during the second policy, there are 11. So the idea of paying thousands of SIRs is really a red herring. The other problem with it, again, is that if you — I think we're way over time. I'm sorry, Your Honor. We'll give you a couple of minutes for rebuttal. Thank you. Good morning. I'm John Makin with Green and Pepper, Salander & Lally. I'm here with my colleague, Nelson Shea. We represent national casualty. Probably the biggest jumping-off point that Mr. Seabolt and I have is Mr. Seabolt wants to focus on the abstract. The law in California is very clear. When you interpret policy languages for determining whether there's a duty to defend or duty to indemnify, you compare the language of the policy with the claim that's being presented. In this case, the Arista Records claim is the claim being presented. The lawsuit was filed in 2001, which was in the second policy period, what I refer to in our briefs as the 4-4-A policy. However, it alleged that the conduct, the systematic, continuous infringement of copyrighted sound recordings being played over the web without getting a license from the copyright holders began in 1999, during the first policy period. That's the 4-4 policy. Would it be different if each of the ten companies had filed a separate lawsuit? No, Your Honor. It would not have been separate. What would have happened is, to the extent that that the utterances were all commencing in the first policy period, there would have been one loss. There would have been one SIR. And if there had been ten separate lawsuits, there would have been only $25,000 paid by launch with respect to whichever lawsuit expended that money first. Right. But you would have defended all of the lawsuits. Yes. Until the policy limits exhausted, we would have, Your Honor. Yeah. And that's the basic difference in the approach that launch is now taking. It should be noted that over the course of this relationship, from the time the suit was first tendered in 2001 to the time of 2003, there was no protest, there was no Oh, no. This is covered by two policies. The acceptance of the tender of defense under reservation of rights made it very clear there was one loss, one SIR, and it was being defended under the 4-4, the first policy. It was defended for $3 million worth of defense costs. During that time, from 2001 to 2003, the number of plaintiffs in the ERISTA record action, the persons, never changed by increasing or changing and adding anybody. It does appear that there were settlements that deleted people from the suit, but no additional defendants were ever argued or ever added to the lawsuit. The liquid dreams, using Mr. Siebel's phrase, is a red herring, just as Why is it a red herring if, in fact, you have new damage with a new copyright holder that's acquired by one of your plaintiffs? If Let me put it hypothetically. If liquid, if Jay Records had filed a suit. Yes. And you would clearly defend it in the second policy period, right? No, we would not have, Your Honor. If the suit allegations were the same as ERISTA records, if they had alleged that launch media had systematically taken their copyrighted sound recordings, published them on the Web without a license, that would have been the same subject matter. Sure, it would have been, but it would not have occurred in the first policy period. Well, Your Honor, that's why you have to look at the aggregating language, because the this policy is not a straight occurrence policy. It is a policy that is designed to deal with media risks. Right. It is also a policy where the duty to defend isn't triggered until the SIR is paid. Unlike your automobile or homeowners policy that has a deductible, where as soon as the occurrence or the liability-creating action occurs, and there's a claim, there's a duty to defend, in this policy, until the SIR is exhausted, there is no duty to defend. There is no obligation at all under the policy. And in order to determine the SIRs or SIRs that have to be paid, you need to determine how many losses there are. Right. So get back to my example. Yes. Let's assume that Jay Records had never been acquired by any of the plaintiffs in this action. Yes. And Jay Records files an infringement suit alleging infringement within the second policy period. Why would you defend that under the second policy? Because if the allegations of the complaint – and again, this is one of the problems we're having, is that Jay Records isn't in this case. It is not a plaintiff. That's why I call that a hypothetical. I understand. And what I'm trying to do is address that, Your Honor, is that when you're making duty to defend decisions, the law in California is very clear that you don't speculate on what other claims might be covered, what other claims could have made – been made that weren't made. No, but you do look at potential. I mean, California is a little broader than other States in that respect. It would be, Your Honor, but the law is also that you always apply the terms of the policy when making those decisions. I guess I don't understand why. If Jay Records files a copyright infringement suit in the second policy period saying this happened in the second policy period, why you wouldn't defend that under the second policy? We wouldn't defend it under the second policy because it would have been – assuming the Arista Records action already exists, which it does, it would have been related to that first – that would be a single loss. What would have happened is Jay Records would have been defended under the first policy until the first policy exhausted. If the first policy was already exhausted, there would be no coverage, and that's because of the aggregating language of the policy and the requirement for satisfaction of SIRs. The issue is not whether or not they would be defended. It would be under what policy they would be defended. It's purely about the duty to defend. It's not – nobody's talking about a damnification. I understand, Your Honor. And in this case, again, first and foremost, Jay Records is not a plaintiff. It's not a person. It's not alleging any claims in this case. The only people that are alleging claims in this case that have to do with Liquid Dreams is BMG, and BMG was always a plaintiff in this case. It was a plaintiff in this case for records that – sound recordings that it had copyrighted that were webcast without a license in the 4-4 period, policy period, and the 4-4a policy period. One of the difficulties with the argument that Launch wants to make, that its interpretation of the language is reasonable, is that they've never really consistently decided what their reasonable interpretation is. Initially, they said, well, you know, anytime a copyrighted material is played, that's – that's the subject matter. That would lead to untold numbers of SIRs. Then, originally, it was, well, it should only be two policy periods. It should be all the records that were played in the first policy period, and all the records played in the second policy period should be aggregated together. But that – that couldn't get past the language of the policy that talked about utterances in a policy period or policy periods. Then their argument was, well, there's some number between 2 and 11. Well, they never really explained how you get an interpretation of 2, 3, 4, 5, 6, 7, 8, 9, or 10 losses. Their 11th loss isn't sustained by the record, even if it could possibly be rational, because the record demonstrates in its declarations that were filed that there are dozens and dozens and dozens of sublabels or labels as opposed to record companies. And if that's true, and if their definition of person is the person who owned the the play – the copyrighted song was webcast, they didn't have another situation whereby their own testimony, Mr. Frank's deposition testimony, was that determining who owns a copyright at any particular time is a very difficult task. It's nigh unto impossible in tracking, because they go back and forth. As the declarations and the exhibits established, there were thousands and thousands and thousands of hundreds of different sublabels, and in this case, there were 10 record companies. So let me make sure the rule you want us to adopt here. Let's assume, for example, that there is another insurer who insures the second policy period. You're out. Totally new insurer, same type of policy. What you're saying is, if a decision is made to webcast in the first policy period, the second insurer is completely off the hook. There are absolutely no liability for any infringements that occurred in the second policy period. If their language was the same language as the policies. Yes, Your Honor, it is. And let's assume you've got unlimited liability for defense. There are no caps on defense costs. You're just stuck with whatever infringements occur in perpetuity. To the extent they relate back, yes. But again, Your Honor, I can appreciate if you take an argument to absurdum, you can get absurd guilt. No. That happens all the time, particularly in pollution cases, where you have two or three or four insurers and reinsurers and decide how to allocate the loss. I understand, Your Honor. The distinction here, though, is that unlike pollution cases, environmental cases, where one of the difficulties that has led California to apply the continuous trigger rule is that you can't tell when the damage has occurred. You can't even tell really when the thing happened. In this case, there's no question you can establish that. When the song is broadcast, that's an infringement. People know when that happens. It's readily ascertainable. It can be determined. Just as you can determine who owned the copyrights at the time it was webcast. So this is not a continuous trigger or continuous injury or continuous exposure to harmful conditions kind of case. This is a case where because of media risks, because of whether defamation, whether book copyright publication, theoretically, for example, in a book copyright, every book is in and of itself is a violation. Each time you sell a book is a violation. If you didn't have an aggregation mechanism, what would happen is literally you would have thousands and thousands and thousands of losses. The interpretation that national casualty has consistently applied has yielded one loss in this case. It was a single loss that meant one SIR. One SIR was paid, and then the case was defended for almost two years until the policy limits exhausted. Unfortunately, for launch, they've spent a lot more money on this case than the policy limit. But the fact that the policy limit wasn't adequate doesn't mean that somehow you have to breach the language of the policy to try and get more limits. That's just not the way it works. The other problem with Mr. Siebel's approach to trying to interpret the aggregation language is it's internally inconsistent. When he talks about the aggregation language that the relating to has to be with respect to the utterance, he says, well, it has to be the content of the utterance. So, therefore, the content of the utterance in a copyrighted song recording must be the subject of the song. But then, remarkably, when he wants to talk about person, it's no longer the content of the utterance, it's the status of the ownership. We think, and we have consistently applied, and we've explained to the Court below and here, that the real modification there is it's damages or claims expense arising from utterances during the policy period or periods, because that tracks the language of the insuring agreement. And that whole phrase, that is damages the kinds of damages covered by the policy relating to the same subject, person, or class of persons, is the way the language needs to be read. And it's the only reasonable way to read it with respect to these kinds of media risks, particularly in the ERISTA records action, which is the only thing you can really be looking at to determine whether or not there was any further duties that need to be imposed or can be imposed on national casualty. The ERISTA records action alleged that launch, continuously and systematically, webcast, copyrighted recordings of the plaintiffs, the ten named plaintiffs, from 99 to 2001, during the two policy periods, spanning the two policy periods, without a license. The subject of the potential liability is webcasting, that is, disseminating without a license, copyrighted material. The persons are very, it's very straightforward. The persons is the persons who are trying to impose that liability. In this case, it's the plaintiffs. The plaintiffs never change. Either Liquid Dreams is in because they, BMG got an assignment of rights, in which case it's entitled to assert its rights for copyright infringement to those songs, as well as the thousands of other songs that were broadcast or webcast by launch, both during the 9944 policy or the 2044a policy, or it's not. Or if it's not in the case because Jay Records is the only one who can assert that, then Jay Records files its own action. But and when that action is filed. When that action is filed, Jay Records starts in the second policy period, new company, starts in the, not one of the ten, starts in the, or X Records, starts in the new policy period. Yes. Gets a new song. Yes. And you continue your program of broadcasting this or whatever you do with it. And they file a separate suit. Yes. Is there any coverage for that under the second policy? There would be no coverage under the second policy, assuming that the allegations being made are the same as the allegations being made in the Arista Records action. However, if the Arista Records action had not yet exhausted the policy limit of the first policy. No, no. Arista has exhausted, Arista has exhausted the policy limits in the first policy. And the answer is with respect to that Jay Records suit brought then alleging Second period. So basically what you're saying is you make a decision to infringe in one policy period. And therefore, any infringements that occur in any other policy period going infinitum relate back to the first policy. If it's the same conduct, if it's the same subject matter, Your Honor, again. No. And that's what I'm saying. It's a webcast. You make a decision. You're going to have a webcast of songs. And you have some infringement in one policy period. What you're saying is that the first insurer gets stuck all the way down, whether this could go on 10 years, 20 years. Right? That's your position. Yes, to the limits of their policy. And in this case, the limits of the policy were $3 million. Yes. Well, most policies don't have an upper cap on the difference. I understand that, Your Honor. And that's why this is a media policy that specifically addresses these kinds of media risks. If you start a course of conduct, let's say in defamation, you're writing a series of damaging articles. Yes. And you start an investigation. Is your answer that if you have defamed somebody in the second policy period, it relates back to the first decision about publication? Yes, Your Honor. In this the way the policy is drafted, it specifically refers to utterances in a policy period or policy periods. Right. So the utterances occur in the second policy period. Your argument is they all relate back to the first policy period regardless. Because here you have clearly at least one instance where there's an utterance in the second policy period. No, Your Honor. There's actually utterances. There are multiple utterances in the second policy period. The no, the something that first occurs. In other words, the first utterance is what I'm talking about. There's no evidence that it's the only one that occurred in this. As a matter of fact, the allegation of the first one occurred in the second policy period. The utterance is to this particular plaintiff. This plaintiff is not a plaintiff in the case. No, no. This is where we're on a we're talking about a hypothetical. All right. I understand now. I thought we were talking about a company that didn't exist as a new record, a new song. Yes. Which is all of that occurs during the second period. Yes. That's what I'm trying to say. And you add it to your program of things you're broadcasting. Launch adds it to its program. Yes. Yes, I understand. And that would be the coverage would have been exhausted for that during the first policy period because it's part of your overall program. Yes. And that's because at the time, for example, Liquid Dreams was first uttered, it was prior to the lawsuit being filed. That course of conduct, that liability creating breach and and use of licensed copyright material without a license as a singular continuous business plan had already occurred. But it could be after the lawsuit. I understand, Your Honor. And and I'm your answer. Your question is, yes, under the terms of this policy, there's no insurance, no point in getting insurance for a second policy period. Not true, Your Honor. Absolutely not true. For example, if the argument was the J records had entered into a licensing agreement with Launch Media in the second policy period and that Launch had agreed to pay X dollars and then refused to pay and therefore was in breach, that would be a different course of conduct. Right. The whole business of this is webcasting, basically. Your Honor, it is webcasting. But what I'm saying is I'm not given the hypothetical. As long as we're dealing with hypotheticals, the hypothetical in this case is if J records filed a lawsuit in the second policy period alleging the same course of conduct, that is, that Launch simply took the liquid dreams, played it without ever bothering to get a license, I am agreeing, I'm conceding, Your Honor, if you will, that, yes, that would be in the first policy period because it's the same course of conduct as the Arista Records action covered. But if J records had entered into a license agreement with Launch Media and then the license agreement said you can only broadcast this song no more than ten times in a day or something like that and they breached that agreement, that would be a different subject. That would be — it's not any and all copyright infringement. It's copyright infringement in the context of the Arista Records action. So in that case, Your Honor, in that situation, given that it's a different — it's not related by either the class of persons or the subject matter, then, in other words, they're differently situated, then it would be covered in the second policy. The bottom line is, is that at the end of the day, what Launch wants to do is pick and choose the terms of the policy language that it wants. It wants to aggregate because if it can't aggregate, it knows it's faced with impossible numbers of SIRs to be satisfied. So what it wants to do is it wants to aggregate a little bit by persons and say, well, persons gives us 10 — we'll call it 11. But the fact of the matter is the record doesn't support that. If you look at the Nelson Shea Declaration in the record, it demonstrates that there are dozens and dozens of record labels. If you look at the allegations of the complaint and the Nelson Shea Declaration, you'll see lists of songs, and those songs were over the period not only of the first policy but the second policy period. At the end of the day, what you have is National Casualty made a reasonable decision that maximized coverage for Launch. What Launch has failed to do is they failed to provide any alternative interpretation of the language that they can sustain that demonstrates that it would get more or better coverage than the interpretation offered by National Casualty. Judge Ware made the right decision below, and we ask that it be affirmed. Thank you, Counsel. Briefly, Your Honors, I think, in fact, you have highlighted the absurdity of their interpretation. Under their interpretation, in fact, Jay Records, which is first played in the second policy period, somehow relates to a systematic decision that occurred under the first. Under their view of the world, every copyright infringement, wherever it occurred, whenever it occurred, relates to the same decision and gets related back to the first. The policy language doesn't say that. And, indeed, the supplemental letter that they sent to the Court last week, it's interesting. That language may accomplish what they seek to achieve. That is not the language of this policy. They're entitled to aggregate only if the aggregation language that they used applies. They don't have the language that's in the case that they sent you last week. And, indeed, as Your Honor suggested, under their interpretation, it is clear the principal risk faced by my clients are copyright infringement based on the playing of music on the Internet. It's not a defamation risk. They don't make written statements that could wind up resulting in a defamation risk. It's copyright infringement for the placement of music. Their interpretation would result in there would be no reason for my client to ever pay a premium after the first policy, whether it's with a different insurer or the same insurer, because under their interpretation, absolutely everything gets funneled back and collapsed under the first policy. That makes no sense. That's an absurd result. It also, to go back a little bit to the systematic decision, I'm concerned that it's true the allegations of the complaint make that allegation. But just as the allegations in the complaint in Gray v. Zuris said it was intentional, if that allegation were true, there would have been no coverage under that policy. But that was not the end of the issue. The Supreme Court held that although intentional conduct was alleged and although the allegations would result in no coverage, that there was nevertheless a duty to The plaintiffs in the case allege a systematic decision. In fact, life is much more complicated than that. My clients did reach out to the record labels to try to negotiate license. There were many individual decisions about what to do and what not to do with respect  It will, of course be the case that the record labels are the ones that make the decision. Kagan. Do you want each one of those individual decisions measured? I'm sorry? Do you want each one of those individual decisions measured for purposes of your own That's fine. And it seems to me what you're suggesting is, again, the red herring, which is each of those decisions somehow results in an individual self-insured retention. The problem is that ignores the aggregation language based on person. In the context of a copyright infringement lawsuit, the most reasonable interpretation of what person means is the individual persons who have the rights to make the claims And as a result, there would be 10 or, under our view, 11 such persons. And they would be aggregated on that basis. And that would be the number of SIRs. We don't need to worry about individual decisions or thousands of songs because, in fact, you've got to look at every part of the policy. And if you look at that part of the policy, the aggregation clause applies and would avoid that result. Thank you, Your Honors. Unless you have any other questions. Thank you, counsel. The case just argued will be submitted. Are the counsel for the Davis case here? We're going to take a recess and we'll reconstitute the court for your case. If you'll just wait for about five minutes, we'll let you know whether we're going to hear it now or a little later. By a little later, I mean in an hour or a half hour or so. So just wait here for a few minutes and we'll let you know.
judges: Reinhardt, Rymer, Thomas